# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

FIFTH THIRD MORTGAGE
COMPANY,

        Case No. 1:10-cv-183

       Plaintiff,

        Judge Timothy S. Black

vs.

CHICAGO TITLE INSURANCE
COMPANY,

       Defendant.

## ORDER THAT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 21) BE GRANTED

This civil action is before the Court on Plaintiff's motion for summary judgment (Doc. 21) and the parties' responsive memoranda (Docs. 33, 35).

## I.    BACKGROUND

Plaintiff moves for summary judgment on its complaint[1] and Defendant Chicago Title Insurance Company's ("CTIC") counterclaim.[2] This case is about the parties respective rights and obligations under a title insurance policy. Defendant insured that Plaintiff's mortgage to Anthony Buford would be the first and best lien on real property located at 7694 Plantation Drive in Mason, Ohio. Defendant allegedly missed title defects created by its issuing agent's fraud and, accordingly, Plaintiff's mortgage was not the first and best lien. Subsequently, Defendant refused to defend and indemnify Plaintiff

---

[1] Plaintiff asserts the following claims: breach of contract (Count I); declaratory judgment (Count II); and bad faith (Count III). (Doc. 1).

[2] Defendant asserts the following counterclaims: rescission (Count I); and declaratory judgment (Count II). (Doc. 15).

in connection with litigation brought in Warren County, Ohio, despite Defendant's

obligations under the title insurance policy. Defendant denied Plaintiff's title claim and

counterclaimed that it is excused from performing its contractual obligations because

Plaintiff's loan to Mr. Buford did not follow objectively reasonable underwriting

standards. Additionally, Defendant argues that since the parties have yet to conduct any

discovery, the Court should deny Plaintiff's motion or, in the alternative, grant Defendant

leave to conduct the necessary discovery pursuant to Fed. R. Civ. P. 56(f).

## II.    UNDISPUTED FACTS[3]

### A.    The Buford Loan

1.    On April 14, 2006 Defendant and Plaintiff entered into an Issuing Agency
      Contract. (Doc. 1 at ¶ 29).

2.    Plaintiff alleges that on July 11, 2007, it entered into a $406,000 refinance
      loan with Anthony Buford and that the loan was secured by a mortgage on
      the Plantation Property.[4] (Doc. 21, Ex. 2, A and B).

---

[3] The parties only agreed on four undisputed facts. This is deceiving because none of the disputed facts are material. "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). Ultimately, the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Martingale v. City of Louisville*, 361 F.3d 297, 301 (6th Cir. 2004).

[4] Defendant maintains that this loan was a stated income loan, and that Mr. Buford stated that his monthly income was $19,000, when it was not. (Doc. 33, Ex. 1 at 42). Defendant also claims that Plaintiff initially conditioned loan approval on the loan being fully documented – apparently due to the "red flags" on the application. (*Id.* at ¶¶4-5). As a result, on July 3, 2007, Plaintiff "suspended" Mr. Buford's loan application because his stated income appeared to be excessive for his occupation and the tenure at his jobs. (*Id.* at ¶ 5). Plaintiff's underwriting process also flagged a "high impact variance" by virtue of the fact that there was "a notable

3.     Plaintiff alleges that Jolie Neal, a member of Direct Title, acted as the closing agent for the Buford Loan. (Doc. 1 at ¶¶ 66, 145). Direct Title was required to pay off the prior (known) liens on the Plantation Property in accordance with the instructions to title.

**B.     The Policy**

4.     Plaintiff alleges that Defendant (through Direct Title) insured its mortgage by providing a short form Residential Loan policy on July 11, 2007 bearing Policy Nos. OH2439-46-20070099-2007, 7234135-74035393. (Doc. 21 Ex. 2C).

5.     Plaintiff alleges that Defendant's premium for the Policy was paid out of the loan proceeds of the Buford Loan. (Doc. 21, Ex. 2 at ¶ 4).

6.     Plaintiff alleges that under the Policy, Defendant insured Plaintiff against loss or damage by reason of:

   2.    Any defect in or lien or encumbrance on the title. This Covered Risk includes but is not limited to insurance against loss from
       (a)    a defect int he title caused by
       (ii)   forgery, fraud, undue influence, duress...;
       (ii)   failure of any person or entity to have authorized a transfer or conveyance;
       ***
       (iv)   a document executed under a falsified, expired, or otherwise invalid Power of Attorney;

---

variance between [Buford's] income reported in THIS loan and income in OTHER loans for the same BORROWER." (*Id.*, Ex. 1 at 44). As a result, Plaintiff refused to proceed any further unless Mr. Buford produced copies of recent pay stubs, W-2 forms, and federal tax returns. (*Id.*) However, Mr. Buford never provided Plaintiff with copies of any of those documents. (*Id.*) Instead, Plaintiff proceeded to fund the loan without full documentation under its "Quick and Simple" loan program. (*Id.*, Ex. 1 at ¶ 6; Ex. 1 at 53, ¶ 4(i)). Therefore, Plaintiff never verified any of the $940,000 in assets that Mr. Buford reported on his loan application. (*Id.*, ¶ 4(j)). Plaintiff never sought verification of Mr. Buford's income from the IRS – even though he had signed a form authorizing Plaintiff to verify his income at no cost. (*Id.*, Ex. 1 at ¶ 8; Ex. 1 at 53, ¶ 4(m)). Even assuming these facts are true, the Court finds that they are not material because Plaintiff's underwriting policies are not relevant. The material fact is that Defendant issued the Policy and insured title to the property.

\*\*\*

10.   The lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance. (Policy, Doc. 21, Ex. 5 at §§ 2, 10).

7.   Plaintiff alleges that Defendant also agreed to "pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy." *Id.*

## C.   The Warren County Action

8.   Plaintiff alleges that National City Bank initiated a foreclosure action in December 2008 seeking to foreclose its alleged first mortgage lien on the Plantation Property in the Warren County, Ohio Court of Common Pleas (Case No. 08-cv-72546) (the "Warren County Action").

9.   Plaintiff alleges that it intervened and asserted an Answer, Crossclaim, and Counterclaim requesting an order declaring its lien to be the first and best lien on the Plantation Property.

10.   Plaintiff alleges that based on the Warren County Action, Plaintiff became aware of the following liens on the Plantation Property:

a.   Mortgage to National City Bank from Anne M. Cohen in the amount of $139,000 dated February 15, 2006 and recorded March 9, 2006 in the Official Record Book 4134, Page 328 of the Warren County, Ohio Records;

b.   Mortgage to Wachovia Mortgage Corporation from Jolie O. Neal in the amount of $392,000 dated May 12, 2006 and recorded May 25, 2006 in the Official Record Book 4200, Page 361 with Assignment to US Bank National Association, as Trustee for CSAB Mortgage – Backed Pass-Through Certificates, Series 2006-2 in Official Record Book 4872, Page 508 of the Warren County, Ohio Records;

c.   Mortgage to Lehman Brother Bank, FSB from Jolie O. Neal in the amount of $398,000 dated May 16, 2007 and recorded May 24, 2007 in Official Record Book 4463, Page 719 with Assignment to Aurora Loan Services LLC in Official Record Book 4829, Page 548 of the Warren County, Ohio Records.

11.    Each of the above was recorded prior to Mr. Buford's Loan. (Doc. 21, Ex. 2 at ¶ 7).

12.    Plaintiff alleges that on January 12, 2008, it submitted a timely title claim to Defendant demanding that Defendant defend it in the Warren County action and indemnify it from any loss it might eventually suffer based on the defects in the title to the Plantation Property. (Doc. 21, Ex. 2).

13.    Plaintiff alleges that on January 11, 2010, Defendant refused to defend and indemnify it. Defendant's only excuse was that Plaintiff did not follow standard underwriting guidelines in approving Mr. Buford's loan. (Doc. 21, Ex. 2E).

### E.    CTIC's complaint against Ms. Neal and Her Co-Conspirators

14.    On March 11, 2010, Defendant filed suit against Ms. Neal, Mr. Buford, Tri-State, Direct Title, Brookstone, and the Cohens alleging claims based on "several negligent and/or improper real estate transactions" involving the Plantation Property.[5]

15.    Defendant acknowledged receiving title claims on the property and sought indemnification against the defendants as well as damages. (Doc. 1 at ¶ 15).

## III.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine

---

[5] Defendant Chicago Title Insurance Company filed a third party complaint against Jolie Neal, Cronin Financial Services, Anthony Buford, and Direct Title Resource. (Doc. 15). However, none of these individuals or entities are involved in this motion for summary judgment.

disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV.    ANALYSIS

### A.    Whether Defendant is Bound by the Policy

Plaintiff's claims are based on a title insurance policy that Direct Title issued. (Doc. 21, Ex. 5). That document binds Defendant only if Direct Title acted as Defendant's agent when it issued the document. Plaintiff alleges that Direct Title acted in that capacity, but Defendant denies that allegation.

Specifically, Defendant argues that even though it delegated the title search to Direct Title and permitted Direct Title to issue policies on its behalf, Defendant is not bound by the Policy because Direct Title exceeded its actual authority. Defendant alleges that "[i]n a nutshell, Direct Title appears to have misrepresented the status of title for the Plantation Drive Property," which, according to Defendant, violated its issuing agency contract with Direct Title. (Doc. 33 at 7-8). Defendant argues that Direct Title's violation relieves Defendant from its duties under the Policy, because Direct Title was not acting as its agent.

-6-

The issuing agency contract between Direct Title and Defendant required Direct Title to "[r]eceive and process applications for title insurance in a timely, prudent, and ethical manner with due regard to recognized title insurance underwriting practices." (*See* Agency Contract ¶ 4.A, Doc. 33, Ex. A at 16-24). It also had to "[c]omply with all applicable laws and regulations relating to the conduct of [its] business." (*Id.* at ¶4.H). Defendant claims that the contract prohibited Direct Title from participating in transactions in which Direct Title's managing member, Jolie Neal, had an interest. (*Id.* at ¶ 7.H).

Defendant claims that Direct Title violated these restrictions when it issued the title insurance policy and misrepresented the status of title for the Plantation Drive Property. Specifically, Defendant claims that Direct Title: (1) failed to process the request for title insurance in a prudent or ethical manner; (2) failed to examine all of the title documents; (3) violated Ohio law which requires a "reasonable examination of title"[6]; (4) and violated the bar against engaging in a transaction for its managing member, Ms. Neal. Therefore, Defendant argues that Direct Title lacked authority to issue the title insurance policy and exceeded the scope of its authority by issuing it.

Plaintiff maintains that even if Direct Title lacked *actual* authority it had *apparent* authority.[7] "Apparent authority encompasses an agent's actions beyond the scope of the

---

[6] Ohio Rev. Code § 3953.07.

[7] Plaintiff bears the burden of proving "the agency and scope of [the agent's] authority." *Aetna Cas. & Sur. Co. v. Leahey Constr. Co., Inc.*, 219 F.3d 519, 541 (6th Cir. 2000) (noting that, under Ohio law, "[a] party who claims that a principal is responsible for the acts of an [agent] is obligated to prove the agency and scope of [the agent's] authority").

-7-

authority expressly granted him by the company, which the company nevertheless allows

the agent to perform, or which comport with the company's holding out the agent as its

authorized and fully trustworthy representative." *Clements v. Ohio State Life Ins. Co.*,

514 N.E.2d 876, 881 (Ohio 1986).  The apparent authority of an insurance agent is "such

authority as a reasonably prudent man, using diligence and discretion, in view of the

company's conduct, would naturally suppose the agent to possess." *Randall v. Alan L.*

*Rankin Ins.*, 526 N.E.2d 97 (Ohio 1987).  "The power of an agent to bind the insurer is

coextensive with his apparent authority . . . In the absence of any knowledge by the

insured of any limitations on the agent's authority, the insurer's agent has such power as

the insurer has held him out to possess . . . This is true regardless of whether he violates

limitations upon his authority." *Id.* at 100.

A court may determine the existence and scope of an agency relationship as a

matter of law if the relationship is so clear as to be undisputed. *Rhone v. First Am. Title*

*Ins. Co.*, 928 N.E.2d 1185 (Ill. 2010).  In *Rhone*, the Court held that the title insurance

company's relationship with its issuing agent was sufficiently clear based on the insurer

permitting its issuing agent to write insurance:

> "Title insurance companies commonly contract with title insurance
> agents to sell their title insurance.  In this case, the record
> establishes that the Rhones reasonably believed Novit possessed
> apparent authority to act as First American's agent because First
> American held itself out to the public as providing title insurance
> through issuing agents.  Here, First American signed Rhones' title
> policy, which listed Novit & Novit as First American's 'issuing
> agent.'  The ordinary meaning of the words 'issuing agent' reasonably
> conveyed to the Rhones that First American had authorized Novit
> as its agent to issue title insurance policies on its behalf."

*Id.*[8]

In the instant case, the Court finds that the scope and existence of the agency relationship between Defendant and Direct Title is so clear as to be undisputed.[9] Defendant held itself out to the public as providing title insurance through agents. The Policy bears Defendant's signature and seal and lists Direct Title as an issuing agent and "authorized signatory." (*See* Policy at Doc. 21, Ex. 5). Accordingly, Defendant is bound by the Policy.

**B.    Whether Defendant is Obligated to Defend Plaintiff in the Warren County Action**

Defendant insured Plaintiff against loss or damage arising from the following risks (among others): title to the Plantation Property not being vested in Anthony Buford in fee

---

[8] *See also Mortg. Network, Inc. v. Ameribanc Mortg. Lending,* 895 N.E.2d 917, 920-21 (Ohio App. 2008) (denying the insurer's motion for summary judgment when "[t]he relevant facts here demonstrate that Mortgage Network believed that [the title agent] was [the insurer's] duly authorized agent, based on the closing protection letter [the insurer] isued to Mortgage Network. . . . [B]ecause [the insurer] failed to notify Mortgage Network that [the agent] was no longer its agent, [the insurer] is liable for the losses on subseqent closings involving Mortgage Network based on the doctrine of apparent authority.").

[9] Defendant argues that Plaintiff has not alleged or shown what, if any, of Defendant's acts Plaintiff supposedly relied upon . The Court disagrees. The Policy clearly establishes that Direct Title had the authority to act on behalf of Defendant, and this is what Plaintiff relied upon. (Doc. 21, Ex. 5). Additionally, Defendant argues that the lack of discovery purportedly prevents it from presenting facts that describe what Plaintiff and its agents knew about Direct Title's actions and prevents Defendant from presenting facts that describe whether Plaintiff or its agents were involved in wrongdoing. Again, the Court disagrees. The express language in the Policy is sufficient to establish what Plaintiff "knew about Direct Title"- and the allegation that Plaintiff or its agents may have been involved in wrongdoing is a conclusory allegation unsupported by any evidenced fact.

simple;[10] defect in title caused by "forgery, fraud;..."[11] and the lack of priority of the lien

of the Insured Mortgage upon the Title over any other lien or encumbrance.[12]  Defendant

was also obligated to "pay the costs, attorneys' fees, and expenses incurred in defense of

any matter insured against by this Policy."[13]

Defendant claims that it was not required to defend and indemnify Plaintiff for

three reasons: (1) the exclusions for "created loss" and/or "known loss" apply; (2) acts of

Defendant were not the proximate cause of Plaintiff's damage; and (3) Plaintiff

intervened in the Warren County Action.

### 1.    Whether Plaintiff's claim is excluded

Here, the exclusion does not apply with respect to "[d]efects, liens, encumbrances,

adverse claims, or other matters" created, suffered, assumed or agreed to by the insured.

(Policy, Exclusions from Coverage, Doc. 21, Ex. 5 at ¶ 3).  The exclusion applies only

when "the insured is guilty of some misconduct or breach of its obligations which give

rise to the defect, lien, or encumbrance." *Am. Savings & Loan Assoc. v. Lawyers Title*

*Ins. Corp.*, 793 F.2d 780, 785 (6th Cir. 1986).  Plaintiff maintains that it did not know of

or create any defects.  (Doc. 21, Ex. 2 at ¶ 9).  In fact, Defendant's denial letter

acknowledges that Plaintiff did not know about the defects:

---

[10]  Policy, Doc. 21, Ex. 5 at § 1.

[11]  *Id.* at § 2(a)(1)

[12]  *Id.* at § 10.

[13]  *Id.*

-10-

> On the Uniform Underwriting Form that Buford initialed, he
> represented that the mortgage would be in first lien position.
> Further, Buford signed the Status Certification Affidavit which
> stated that Borrower's representations in the loan application
> were true and he provided the affidavit" as material inducement to
> cause Lender to make the loan to Borrowers." However, Buford's
> loan application omitted the mortgages that Neal granted against
> the Property, although Buford knew of both mortgage loans.

(Defendant's Denial Letter, Doc. 21, Ex. 7). Additionally, Defendant's own complaint

asserts that the defects were created by Ms. Neal and her co-conspirators. (Doc. 15 at ¶¶

49-61).

Defendant cites *Am. Sav. & Loan Assn.* for the proposition that exclusions for the

defects "created, suffered, assumed or agreed to" often turns on notions of equity. 793

F.2d 780. However, *Am. Sav. & Loan Assn.* actually supports Plaintiff's argument. In

rejecting the trial court's finding that the title claim was excluded, the appellate court

admonished the insurer for trying to relieve itself "of a once attractive decision that ha[d]

soured."

> Insurers, just as other makers of contracts, are dependent
> upon the fiscal attractiveness of their proposals in order to
> induce would be purchasers to buy. In the case of insurance,
> the attractiveness, necessary to induce buyers, is found in the
> broadness of coverage, or the lack of limited conditions.
> Where an insurer, with due regard to its own financial liability,
> writes the contract without certain limiting conditions, and
> thereby hopefully enhances his selling position, the Court will
> refuse to then withhold from the buyer the coverage for which
> he has contracted by adding conditions unwarranted by a
> reasonable construction of terms of the policy as issued.

*Id.* at 783. Under the same reasoning, this Court also declines to exclude Plaintiff from coverage under the Policy.

## 2. Whether Plaintiff's underwriting guidelines are relevant

Defendant contends that Plaintiff should bear the risk of its issuing agent and Mr. Buford's scheme because Plaintiff's loan to Mr. Buford was negligent.

In Ohio "public policy dictates that every contract contain an implied duty for parties to act in good faith and to deal fairly with each other." *Littlejohn v. Parrish*, 839 N.E.2d 49, 54 (Ohio App. 2005). However, this implied duty does not supplant express contract terms. *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 662 N.E.2d 1074 (Ohio 1996). Rather, it requires good faith in performing those contract terms. *Lakota Local School Dist. Bd. of Edu. v. Brickner*, 671 N.E.2d 578, 584 (Ohio App. 1996) ("good faith is part of a contract claim and does not stand alone."). There is not "a general duty of care owed by lenders . . ., especially not one that would create tort liability based on internal lending guidelines." *Whitley v. Taylor Bean & Whitacker Mort. Corp.*, 607 F.Supp.2d 885, 902 (N.D. Ill. 2009).

In Ohio, insurance contracts are construed as any other written contract. *Scott v. Allstate Indem. Co.*, 417 F.Supp. 2d 929, 932 (N.D. Ohio 2006). An insurance contract will only require interpretation if the applicable language is ambiguous – that is, open to more than one interpretation. *Id.* Because it is typically the insurance carrier that drafts the contract, ambiguous language within an insurance contract must be construed strictly

against the insurer and liberally in favor of the insured. *Id.* The Court finds that the terms of the Policy at issue are unambiguous. Plaintiff's obligations to Defendant are contained in the Policy which does not even mention underwriting practices or requirements.

In fact, a court under very similar circumstances rejected Defendant's argument. In *Fidelity Natl. Title Ins. Co. v. Matrix Fin. Servs. Corp.*, 255 Ga. App. 874, 874-880 (2002), the insurer, Fidelity, argued that Matrix, the lender, should not have closed the loan, and by doing so created its own title problems. The Court noted that, like in the instant case, Fidelity did not point to any policy provision excluding a mortgage transaction from coverage, that in its view should not have closed:

> Regardless of the circumstances underlying the loan transaction, Fidelity agreed to insure the priority of Matrix's interest in the property. By issuing the title insurance, Fidelity gave its opinion 'concerning the validity of the title, backed by an agreement to make that opinion good if it should prove to be mistaken and a loss should result in consequence.' It cannot avoid its policy obligations simply by second-guessing Matrix's decision to close the loan. Regardless, of whether Jones was an appropriate loan risk, Fidelity insured the title.

*Id.* at 879-880.

Under the Policy in the instant case, Defendant was obligated to find defects, liens, and encumbrances, and protect Plaintiff from hidden risks. Had Defendant performed its duty under the Policy, it would have found defects and Plaintiff would not have made the loan. Plaintiff's underwriting guidelines are irrelevant pursuant to the express terms of the Policy.

### 3. Whether Defendant's failure to report title defects proximately caused Plaintiff's damage

Defendant argues that Plaintiff's loss is "self-inflicted" and, therefore, not covered by the Policy. Specifically, Defendant maintains that if Plaintiff had not approved the loan, it would not have suffered any loss. (Doc. 33 at 10). However, Defendant's argument is taken out of order. Plaintiff would not have made the loan had Defendant reported title defects. Mr. Buford's failure to pay on his loan did not create Plaintiff's damages, Defendant's failure to properly place Plaintiff's mortgage in first lien position did. Had Plaintiff's mortgage been in the first lien position, it would have recovered its damages with title to the property.

Additionally, Defendant argues that the Policy is an indemnity contract and not a guaranty of title.[14] However, this is a distinction without a difference. Defendant represented that "[t]itle insurance will pay for defending against any lawsuit attacking your title as insured, and will either clear up title problems or pay the insured's losses."[15] Regardless of how Defendant characterizes it, that is guaranty of title.

### 4. Whether the fact that Plaintiff intervened in the Warren County Action excuses Defendant from defending it

Defendant refused to defend Plaintiff in the Warren County action because it

---

[14] A guarantee clause is a provision in a contract, deed, or mortgage in which one person promises to pay the obligation of another. An indemnity clause is a contractual provision in which one party agrees to answer for any specified or unspecified liability or harm that the other party might incur. Black's Law Dictionary (7th ed. 1999).

[15] Why Do You Need Title Insurance. Available at: www.ctic.com/whyneedtitle.asp

claims that Plaintiff "was not a defendant in a case in which a covered claim had been asserted against it." (Doc. 33 at 21). Defendant is correct that, generally speaking, a title insurer is obligated to defend an action asserted by a third party, but has the option to institute an action on its insured's behalf when no litigation yet exists. *See* Joyce Palomar, Title Insurance Law § 11:11 (2009). However, in this case, National City Bank, a third party, instituted the litigation seeking to foreclose on the Plantation Property. Therefore, Defendant had a duty to defend. This is not a case where Plaintiff asked Defendant to institute litigation on its behalf. The litigation had already been instituted, and Plaintiff was a defendant in the case.

Accordingly, Plaintiff is entitled to: (1) summary judgment on its breach of contract claim (Count I); (2) summary judgment on its declaratory judgment claim (Count II), as well as Defendant's declaratory judgment claim (Count II of the Counterclaim); and (3) a declaration that Defendant is required to defend Plaintiff in the Warren County Action and indemnify Plaintiff from any losses it suffers in connection with the Buford Loan.

## C.    Rescission

In its counterclaim, Defendant seeks to rescind the Policy. Defendant contends that Plaintiff defrauded it by implicitly representing that it followed reasonable underwriting standards. Plaintiff claims that it is entitled to summary judgment on Defendant's counterclaim.

### 1. Whether underwriting standards are part of the Policy

In order to maintain an action to rescind a contract on the ground that it was procured by fraudulent representations, it must be proved by clear and convincing evidence:

> (1) that there were actual or implied representations of material matters of fact; (2) that such representations were false; (3) that such representations were made by one party to the other with knowledge of their falsity; (4) that they were made with intent to mislead a party to rely thereon and (5) that such party relied on such representations with a right to rely thereon.

*Spriggs v. Martin*, 182 N.E.2d 20 (Ohio App. 1961).[16] The Policy at issue does not mention underwriting and does not require Plaintiff to provide any documentation regarding its "underwriting standards."

Defendant argues that state and federal law require Plaintiff to adopt "real estate lending policies" that apply, among other requirements, "safe and sound banking practices" and "prudent underwriting standards" (Doc. 33 at 15), and, therefore, an express provision in the Policy regarding such underwriting standards is not necessary. In support of its argument, Defendant cites Ohio Adm. Code § 1301:1-3-01(A)-(B)(2)(b), which states:

---

[16] Defendant cites *May v. State Farm Ins. Co.*, No. 90AP-1407, 1991 Ohio App. LEXIS 2327 (Ohio App. May 14, 1991), for the standard to rescind an insurance contract. *May* is instructive in that it expressly states that "[i]n order to rescind a contract of insurance on the ground that it was obtained by fraudulent representations made by the insured *which were contained in and made a part of the policy*, the insurer must prove..." *Id.* at 5 (emphasis added).

-16-

(A)   Each bank shall adopt and maintain written policies that establish appropriate limits and standards for extensions of credit that are secured by liens or interests in real estate

\*\*\*

(B)(1) Real estate lending policies adopted pursuant to this rule shall be all of the following:

    (a)   Consistent with safe and sound banking practices;

    (b)   Appropriate to the size of the institution and the nature and scope of its operations

    (c)   Reviewed and approved by the bank's board of directors at least annually.

(2) Real estate lending policies shall establish all of the following:

    (a)   Loan portfolio diversification standards;

    (b)   Prudent underwriting standards, including loan-to-value limits, that are clear and measurable\*\*\*.

However, each of these code sections simply provides subjective guidelines for the lender's internal policies. Contrary to Defendant's argument, these code sections do not automatically become part of an enforceable contract. The codes govern Plaintiff's internal standards, they do not create additional rights under the contract.

## 2.   Materiality

"The insured's duty to make a fair disclosure of the facts means that he or she must disclose information which is material to the risk involved. Whether information not disclosed is material is a question of law for the court." *Collins v. Pioneer Title Ins. Co.*, 629 F.2d 429, 434 (6th Cir. 1980). Here, the insured risk was title to the Plantation Property.

Plaintiff maintains that Defendant's claim fails because any representation it made relating to the underwriting of the Buford Loan was immaterial because the underwriting standards were not an essential condition of issuing the Policy, and Defendant did not request any information relating to the underwriting of the Buford Loan before issuing the Policy. (Doc. 21, Ex. 2 at ¶ 5). The Court finds that if the underwriting standards were truly material to Defendant's decision to issue the policy, then the Policy would expressly state that the lender's underwriting would be subject to Defendant's approval.

Even if the Court determined that Plaintiff made a material misrepresentation, Defendant still cannot rescind the Policy. "Although an applicant's misstatement in an insurance application, if shown to be material to the risk and fraudulently made, is grounds for cancellation of the policy, such representation, standing alone, does not render the policy void *ab initio* and may not be used to avoid liability arising under the policy after such liability has been incurred." *Allstate Ins. Co. v. Boggs*, paragraph 1 of syllabus, 271 N.E.2d 855, 857 (Ohio 1971).

Accordingly, Plaintiff is entitled to summary judgment against Defendant's counterclaim for rescission. (Count I).

### D. Plaintiff's Bad Faith Claim (Count III)

Defendant suggests that the Court should deny or delay a ruling on Plaintiff's bad faith claim because: (1) Ohio law does not support Plaintiff's demand for summary judgment on its bad faith claim; and (2) the Court cannot decide on the current record whether Plaintiff breached its duty of good faith and fair dealing.

-18-

### 1.    Bad Faith

Plaintiff argues that by refusing to consider its title claim and instead concocting a legally baseless excuse to deny coverage, Defendant acted in bad faith as a matter of law.

Ohio law requires an insurer to act in good faith in handling and paying the claims of its injured. *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1316 (Ohio 1983). "An insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefore." *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 1389, paragraph one of the syllabus (Ohio 1994). The requirement to act in good faith includes both the duty to investigate in good faith and provide a reasonable justification for denial. *Id*. at 555. A finding of a particular intent is not an element of bad faith. *Wagner v. Midwestern Indem. Co.*, 699 N.E.2d 507, 510 (Ohio 1996). An insurer lacks reasonable justification when it denied the claim in an arbitrary or capricious manner. *Great Western Cas. Co. v. Flandrick*, 605 F.Supp.2d 955, 979-80 (S.D. Ohio 2009).

For example, in *Fidelity Nat'l Title Ins. Co. v. Matrix Fin. Servs. Corp.*, when the insurer denied a title claim based on the alleged "negligent underwriting" of the lender, the court affirmed an order granting summary judgment for the lender on the bad faith claim:

> "The trier of fact generally resolves questions of bad faith. In this case, however, we agree with the trial court that summary judgment was proper. Matrix obtained a title insurance policy to guard against a defect in the title. The policy required Fidelity to

> pay-or otherwise cure the title problem – in the even of such
> defect. Here, a defect clearly existed, triggering Fidelity's
> obligations under the policy.
> ***
> Even if, as Fidelity claims, Matrix negligently closed the Jones
> loan, Fidelity was not relieved of its obligations under the title
> insurance policy . . . And although the title policy gave Fidelity
> the right to litigate the title dispute, it instead insisted that Matrix
> bring such an action. Under the policy terms, Fidelity's effort to
> shift this responsibility to Matrix was unreasonable.
> ***
> Accordingly, the trial court did not err in awarding Matrix
> summary judgment on its bad faith allegations.

255 Ga. App. 874, 880 (Ga. App. 2002).[17]

Defendant attempts to distinguish the *Matrix* case on the grounds that it dealt with

Georgia law and not Ohio law.[18]  (Doc. 33 at 28).  However, the laws are not

distinguishable.  In Georgia, an insurer engages in bad faith when it lacks reasonable and

probable cause for refusing to pay a claim.  As such, in *Matrix*, the court considered

whether the denial was reasonable, *i.e.*, whether the insurer lacked reasonable justification,

and it determined as a matter of law that it was unreasonable to deny coverage based on

the lender's underwriting guidelines.

---

[17]  *See also Brown v. Guarantee Title & Trust/ARTA*, No. 94-41, 1996 Ohio App. LEXIS
3812, at *9 (Ohio App. May 28, 1996) (affirming a bad faith verdict in connection with Brown's
title claim when the title insurer declined to undertake a complete defense and instead (under
reservation of right) paid only one-third of the cost of Brown's defense and when [the insurer]
failed to meaningfully respond to [Brown's] claim for reimbursement of legal fees for a full
eleven months before [Brown] eventually filed suit).

[18]  Defendant notes that Plaintiff failed to cite any *Ohio* decision granting summary judgment
to an insured on a bad faith claim in the title insurance context.  The Court acknowledges this
fact.  However, the Court finds equally as instructive the fact that Defendant failed to cite an
Ohio case denying a bad faith claim in the title insurance context.

Accordingly, for these reasons, and the reasons explained *supra* at Section IV.A and B, the Court finds that the Defendant acted in bad faith as a matter of law.

## 2. Good-Faith-and-Fair-Dealing Defense

Defendant argues that the duty of good faith and fair dealing[19] prevents summary judgment based on the following premises: (1) that the Policy contains a "gap" with respect to its terms; and (2) that the "gap" could not have been contemplated by Defendant at the time of drafting.

Although public policy dictates that every contract contain an implied duty to act in good faith and to deal fairly with each other, that implied duty does not supplant express contract terms. It arises only where a matter was not resolved explicitly by the parties. "[T]his duty is implied only under limited circumstances, such as when the contract is silent as to an issue. In such a case, the parties must use good faith in filling the gap." *Savedoff v. Access Group, Inc.* 524 F.3d 754, 764 (6th Cir. 2008).

### a. There is not a gap in the Policy

The obligation to perform in good faith is limited when sophisticated business entities have a contract:

---

[19] The duty of good faith and fair dealing is a duty that is implied in some contractual relationships, requiring the parties to deal with each other fairly, so that neither prohibits the other from realizing the agreement's benefits. This duty is most commonly implied in insurance contracts, and usually against the insurer regarding matters such as the insurer's obligation to settle reasonable demands that are within the policy's coverage limits. Black's Law Dictionary. (7th ed. 1999).

[t]he above limited application of the implied good faith duties serves important contractual purposes. Where a party wishes to impose specific obligations upon the other contracting party on a matter not central to the contract, those obligations must be bargained for an included in the contract . . . This also prevents courts from having to flounder through unexpressed intentions in a vein attempt to discern the true agreement of the parties. To impose such a duty upon courts would thwart the very purposes of objective contractual interpretation . . .Where the parties are sophisticated parties who engaged in extensive negotiations, where the contract expressly addresses specific issues, and where the contested provisions are not central to the existence of the contract or to performance of the purposes of the contract, a court may not read into the contract terms which the parties have not included.

*Bd. of Trustees of Union Twp. v. Planned Develop. Co. of Ohio*, No. CA 2000-06-109,

2000 Ohio App. LEXIS 5780 at *7 (Ohio App. Dec. 11, 2000).

In the instant case, the parties are sophisticated companies and the Policy is clear and specific with respect to their rights and obligations. There is no reason to conclude that the failure to refer to underwriting guidelines is a gap that must be filled by the implied good faith obligation.

### 2. Defendant could have included a provision regarding Plaintiff's underwriting guidelines

Even if Defendant could overcome the hurdle that there was a gap in the Policy with respect to Plaintiff's underwriting guidelines, summary judgment is still appropriate on the good faith and fair dealing defense because the gap is required to address a matter that the parties could not have contemplated at the time of drafting.

-22-

> The covenant acts merely as a gap filler to deal with circumstances
> not contemplated by the parties at the time of contracting. Since
> good faith is merely a way of effectuating the parties' intent in
> unforeseen circumstances, the implied covenant has nothing to
> do with the enforcement of terms actually negotiated and
> cannot block the use of terms that actually appear in the contract.

*United States v. Basin Elec. Power Coop.*, 248 F.3d 781, 796 (8th Cir. 2001). The instant

case does not present a situation where the duty of good faith is required to "fill a gap" in

the Policy. There is nothing to suggest that the parties "could not have contemplated" that

they wanted Plaintiff's underwriting guidelines to be part of the Policy.

Accordingly, Defendant's good faith defense fails.

### E. Rule 56(f) Relief

In an effort to delay the inevitable, Defendant invokes the protection of Fed. R. Civ.

P. 56(f), and maintains that without discovery it cannot properly respond to Plaintiff's

motion for summary judgment. Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the
> motion that the party cannot for reasons stated present by affidavit
> facts essential to justify the party's opposition, the court may
> refuse the application for judgment or may order a continuance to
> permit affidavits to be obtained or depositions to be taken or
> discovery to be had or may make such other order as is just.

Upon careful review of Defendant's affidavit, the Court finds that it does not supply any

disputed issues of *material* fact. (Doc. 33, Ex. 1 at 11-15).

Moreover, the nonmoving party must show how postponement of a ruling on the

motion will enable him to rebut the motion for summary judgment. Mere speculation that

additional discovery will lead to facts supporting an allegation cannot withstand a motion

for summary judgment

> Rule 56(f) is not a shield that can be raised to block a motion for
> summary judgment without even the slightest showing by the
> opposing party that his opposition is meritorious. A party
> involving its protections must do so in good faith by affirmatively
> demonstrating why he cannot respond to a movant's affidavits as
> otherwise required by Rule 56(e) and how postponement of a ruling
> on the motion will enable him, by discovery or other means, to
> rebut the movant's showing of the absence of a genuine issue of
> fact.

*Emmons v. McLaughlin*, 874 F.2d 351, 356 (6th Cir. 1989). Defendant fails to allege

specific facts that would overcome fundamental defects in its claims or the ability to

defend against the claims filed against it. Even if additional discovery would prove each

of Defendant's alleged disputed facts, Plaintiff would still prevail. *See, e.g., supra*,

Section II, fn 4.

Therefore, Defendant's motion for a continuance to pursue additional discovery is

denied.

## V.     CONCLUSION

Accordingly, for the reasons stated herein, Plaintiff's motion for summary judgment

(Doc. 21) is **GRANTED**. Plaintiff is entitled to:

1.     Summary judgment on its breach of contract claim (Count I);

2.     Summary judgment on its declaratory judgment claim (Count II);

3.     Summary judgment on its bad faith claim (Count III);

-24-

4.      Summary judgment against Defendant's rescission claim (Count I of the
        Counterclaim);

5.      Summary judgment against Defendant's declaratory judgment claim (Count
        II of the Counterclaim); and

6.      Pursuant to the express lanugage of the Policy, Defendant is hereby
        **ORDERED** to defend Plaintiff in the Warren County Action and indemnify
        Plaintiff from any losses it suffers in connection with the Buford Loan.

**IT IS SO ORDERED.**

Date: 12|17|10

_Timothy S. Black_
Timothy S. Black
United States District Judge